# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Barbara M.,                                    Case No. 18-cv-1749 (TNL)

        Plaintiff,

v.                                             **ORDER**

Andrew Saul,
Commissioner of Social Security,[1]

        Defendant.

---

Fay E. Fishman, Peterson & Fishman, 2915 South Wayzata Boulevard, Minneapolis, MN 55405 (for Plaintiff); and

Michael A. Moss, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite A702, Dallas, TX, 75202 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Barbara M. brings the present case, contesting Defendant Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

This matter is before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 9, 11.) For the reasons set forth below, Plaintiff's motion is granted in part and

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. *Andrew Saul*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner html (last visited Sept. 17, 2019). The Court has substituted Commissioner Saul for Nancy A. Berryhill. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

denied in part; the Commissioner's motion is granted in part and denied in part; and this matter is remanded to the Social Security Administration for further proceedings consistent with this opinion.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in October 2014, asserting that she is disabled due to "chronic back pain, left side leg and foot pain, stimulator put in, nerve pain, complex regional pain disorder, and s/p work injury."[2] (Tr. 87; *see* Tr. 15, 98, 100, 112.) Plaintiff's DIB application was denied initially and again upon reconsideration. (Tr. 15, 96, 98, 110, 112.) Plaintiff appealed the reconsideration of her DIB determination by requesting a hearing before an administrative law judge ("ALJ"). (Tr. 15; *see* Tr. 124-38.)

The ALJ held a hearing in May 2017. (Tr. 15, 37-86.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied her request for review. (Tr. 1-4, 12-36.) Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) The parties have filed cross motions for summary judgment. (ECF Nos. 9, 11.) This matter is now fully briefed and ready for a determination on the papers.

## III. GENERAL MEDICAL BACKGROUND

Plaintiff has a history of back pain stemming from a work injury in 2010 when she was moving and unloading a pallet of frozen food while working in the bakery of a grocery store. (Tr. 41-42, 520, 546, 1996-97.) Plaintiff has had several surgeries to treat her back

---

[2] While Plaintiff asserts that she also included depression and anxiety among her disabling conditions, (Pl.'s Mem. in Supp. at 2, ECF No. 10), depression and anxiety were not listed. (*See* Tr. 87, 100.)

pain, including a partial laminectomy and discectomy in 2010; "extensive decompression of both the L5 and S1 nerve roots" and "an anterior L5-S1 fusion . . . as well as a revision left L5 hemilaminectomy, left L5-S1 medial facetectomy, and left L5 foraminotomy with a posterior spinal fusion" in 2011; hardware removal and fusion in 2013; and the implantation and subsequent "revision" of a spinal cord stimulator in 2014. (*See* Tr. 1998-2002; *see, e.g.*, 525-26, 542, 553-54, 567-76, 594-95, 912-13, 1082-83.) Plaintiff continued experiencing varying degrees of back pain and radiating pain with numbness into her legs and feet. (*See, e.g.*, Tr. 540, 542, 1672, 1721, 1746, 1768, 1776, 1782, 1790, 1805, 1879, 1997-2004; *see also, e.g.*, Tr. 1645, 1663-64.)

Plaintiff began treatment at the Twin Cities Pain Clinic with Andrew J. Will, MD, in November 2012 for persistent low-back pain, radiating into her left leg and foot. (Tr. 601.) Plaintiff received treatment at the Twin Cities Pain Clinic appxoimately once per month in 2013 and twice per month in 2014. (*See, e.g.*, 608, 611, 614, 617, 621, 624, 627, 630, 633, 636, 639, 1023, 1027 (2013); 1036, 1040, 1043, 1046, 1050, 1058, 1064, 1067, 1071, 1075, 1079, 1093, 1097, 1101, 1105, 1107, 1111, 1145, 1147, 1152 (2014); *see also* Tr. 1125, 1129, 1133, 1137, 1139, 1143.) Plaintiff's functioning improved somewhat with medication. (*See, e.g.*, Tr. 606, 610, 613, 616, 626, 629, 632, 635, 638, 1022, 1029, 1042, 1060, 1065, 1069, 1081, 1099, 1103.)

Plaintiff continued to experience radiating low-back pain. In December 2013, Dr. Will inserted a spinal cord stimulator on a trial basis. (Tr. 1030; *see* Tr. 1032, 1034.) Plaintiff "report[ed] getting 50% pain relief" and the spinal cord stimulator "increased her ability to perform her normal activities of daily living." (Tr. 1035; *see also* Tr. 1036, 1038.)

In April 2014, Dr. Will implanted a spinal cord stimulator. (Tr. 1047; *see* Tr. 1048, 1054, 1056, 1062.) While Plaintiff received some initial pain relief after the spinal cord stimulator was implanted, it was subsequently determined that the leads of the spinal cord stimulator had moved and needed to be adjusted. (*Compare* Tr. 1052, 1054 *with* Tr. 1065, 1069.)

In September 2014, Dr. Will revised the placement of the leads. (Tr. 1082.) Following the procedure, Plaintiff was subsequently admitted to the hospital for approximately nine days due to uncontrolled pain. (Tr. 1084-92; *see also* Tr. 1118-24, 921-35.) Plaintiff was subsequently discharged to a nursing facility where she remained until the end of October. (Tr. 1092, 1107; *see* Tr. 937-1019.)

In October 2014, Dr. Will, "in collaboration with Cara A. Herrmann, CNP," expressed concern that Plaintiff "may be developing [Complex Regional Pain Syndrome ('CRPS')]."[3] (Tr. 1095; *accord* Tr. 1127.) Two months later, Herrmann assessed Plaintiff with "postlaminectomy syndrome of [the] lumbar region" and "[r]eflex sympathetic dystrophy of the lower limb."[4] (Tr. 1150.) Towards the end of November 2014 and into

---

[3] CRPS

> is a chronic (lasting greater than six months) pain condition that most often affects one limb (arm, leg, hand, or foot) usually after an injury. CRPS is believed to be caused by damage to, or malfunction of, the peripheral and central nervous systems. The central nervous system is composed of the brain and spinal cord; the peripheral nervous system involves nerve signaling from the brain and spinal cord to the rest of the body. CRPS is characterized by prolonged or excessive pain and changes in skin color, temperature, and/or swelling in the affected area.

*Complex Regional Pain Syndrome Fact Sheet*, Nat'l Inst. of Neurological Disorders & Stroke, Nat'l Insts. of Health, https://www.ninds.nih.gov/disorders/patient-caregiver-education/fact-sheets/complex-regional-pain-syndrome-fact-sheet (last visited Sept. 17, 2019) [hereinafter *CRPS Fact Sheet*].

[4]

> CRPS is divided into two types: CRPS-I and CRPS-II. Individuals without a confirmed nerve injury are classified as having CRPS-I (previously known as reflex sympathetic dystrophy syndrome). CRPS-II (previously known as

January 2015, Plaintiff had a series of nerve blocks, which helped with her pain. (Tr. 1105, 1107, 1109, 1111, 1145, 1147, 1152, 1154, 1156, 1159, 1161; *see also* Tr. 1137, 1143.) Plaintiff also reported some relief from her spinal cord stimulator at night, which helped her sleep. (*See, e.g.*, Tr. 1147, 1156, 1159.)

In March 2015, Plaintiff began treatment with Todd M. Hess, MD, for her continuing back and leg pain. (Tr. 1206-07.) Among other things, Dr. Hess assessed Plaintiff with "reflex sympathetic dystrophy/CRPS of the left lower extremity." (Tr. 1213; *see also, e.g.*, Tr. 1221, 1379, 1381.) Plaintiff saw Dr. Hess on average twice per month for injection therapy, namely, lumbar sympathetic and stellate ganglion blocks, between April 2015 and October 2016. (Tr. 1226, 1232, 1260, 1289, 1299, 1326, 1379, 1422, 1504, 1515, 1540, 1553, 1562, 1576, 1608, 1630, 1644, 1663, 1671, 1677, 1708, 1715, 1721, 1728, 1735, 1745, 1752, 1759, 1767, 1775, 1781, 1789, 1797, 1804, 1814; *see also* Tr. 411 ("[Plaintiff] is currently seeing Dr. Hess every two weeks for repeat injection therapy.").) Plaintiff received injection therapy approximately once per month between November 2016 and March 2017. (Tr. 1830, 1860, 1869, 1879, 1886.)

In or around the beginning of July 2015, Plaintiff was in a car accident where "she fell asleep for a few seconds while driving and rear[-]ended a truck and trailer." (Tr. 2003; *see* Tr. 1319, 1327.) Plaintiff fractured her left arm when it hit the steering wheel. (Tr.

---

causalgia) is when there is an associated, confirmed nerve injury. As some research has identified evidence of nerve injury in CRPS-I, it is unclear if this disorders will always be divided into two types. Nonetheless, the treatment is similar.

*Id.*

2003; *see* Tr. 1327.)  Plaintiff reported that "her medications were making her very sedated." (Tr. 1327.)  Following the accident, Plaintiff "developed signs and symptoms of reflex sympathetic dystrophy" in her left arm and continued to have pain.  (Tr. 2004; *see*, *e.g.*, Tr. 1645, 1663-64, 1672, 1678, 1716, 1746, 1768, 1776, 1790; *see also* Tr. 1729, 1869.)

In October 2015, Dr. Hess noted that CRPS symptoms had spread into both of Plaintiff's lower extremities and her left upper extremity, and continued thereafter.  (*See* Tr. 1515-16, 1540-42; *see, e.g.*, Tr. 1553, 1555, 1562, 1564, 1576, 1578, 1608, 1610, 1630, 1632, 1644, 1646, 1663, 1665, 1671, 1673, 1677, 1679, 1700, 1708, 1710, 1715, 1717, 1721, 1723, 1728-29, 1735, 1737, 1745, 1747, 1752, 1754, 1759, 1761, 1767, 1769, 1775, 1777, 1781, 1783, 1789, 1791, 1797, 1799, 1804, 1806, 1814-15, 1830-31, 1860, 1862, 1869, 1870, 1879-80, 1886, 1887.)

In early March 2016, Dr. Hess noted that "it remains [his] opinion that [Plaintiff] is unable to work from a medical standpoint and qualifies for disability." (Tr. 1709; *see also, e.g.*, Tr. 1609, 1699, 1716.)  Dr. Hess further noted that "[w]e may need a functional capacity evaluation to properly delineate her current capabilities." (Tr. 1709.)  Two weeks later, Dr. Hess ordered a functional capacity evaluation.  (Tr. 1716.)

In May 2016, Plaintiff underwent a functional capacity evaluation.  (Tr. 1683-98; *see* Tr. 1743-47.)  In relevant part, the occupational therapist concluded that, in an 8-hour workday, Plaintiff could sit for 6 hours, at 30 to 45-minute intervals; stand for 1 to 2 hours, at 10-15 minute intervals; and walk for 2 hours, for "[s]hort distances and [at a] slower pace." (Tr. 1683.)  In the comments section, the occupational therapist stated that Plaintiff

should be "[a]llow[ed] . . . to self[-]pace with activities."  (Tr. 1683.)  In the test results and interpretation portion of the functional capacity evaluation, the occupational therapist recommended that Plaintiff "have the ability to self[-]pace with activities requiring upper extremity coordination."  (Tr. 1691.)

In February 2017, Plaintiff underwent another procedure to have the "wires" of the spinal cord stimulator placed "deeper."  (Tr. 1875.)

## IV. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).  "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision."  *Id.*  This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it."  *Id.*  The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ."  *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012).  "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole."  *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted).  Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); *accord* 20 C.F.R. § 404.315 (2014).[5] An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

## A. Residual Functional Capacity

Plaintiff's assertions of error primarily concern the ALJ's residual-functional-capacity determination at step four. *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir.

---

[5] All references herein are to the 2014 regulations.

2005) ("The fourth step in this analysis requires the ALJ to determine a claimant's [residual functional capacity]." (quotation omitted)).

A claimant's "residual functional capacity is the most [she] can do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). "Medical records, physician observations, and the claimant's subjective statements about h[er] capabilities may be used to support the [residual functional capacity]." *Id.* "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Id.* (quotation omitted); *see* 20 C.F.R. § 404.1546(c).

In determining her residual functional capacity, Plaintiff argues that the ALJ erred by not including limitations for "self-pacing"[6] as well as concentration and focus, and not giving proper weight to the opinions of Drs. Hess and Will.

---

[6] While Plaintiff summarizes various limitations identified in the May 2016 functional capacity evaluation, (Pl.'s Mem. in Supp. at 32), the only specific limitation from the functional capacity evaluation that she discusses in any sort of detail is self-pacing. As Plaintiff has not developed arguments as to any of the remaining limitations, these are waived and the Court discusses only self-pacing. *See Hacker v. Barnhart*, 459 F.3d 934, 937 n.2 (8th Cir. 2006) ("A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue." (quotation omitted); *see also Aulston v. Astrue*, 277 F. App'x 663, 664 (8th Cir. 2008) (declining to address "undeveloped argument").

## B.  Self-Pacing

### 1.  Dr. Frazin's Testimony

At the hearing before the ALJ, Jared A. Frazin, MD, testified as the medical expert.

(Tr. 65-77.)  The ALJ asked Dr. Frazin whether he "overall concur[red] with what was set

forth in the functional capacity evaluation."  (Tr. 70.)  Dr. Frazin responded, "Yeah.  I think

that would be reasonable."  (Tr. 70.)  Dr. Frazin went on, however, to identify additional

limitations with respect to Plaintiff's upper extremities and the working environment.  (*See*

Tr. 70-71, 73-76.)  Dr. Frazin opined there were no limits on Plaintiff's right hand.  (Tr.

75.)  For Plaintiff's left[7] hand, Dr. Frazin opined occasional overhead reaching and frequent

reaching in all other directions; frequent handling; occasional fine fingering; and frequent

---

[7] During the hearing, Dr. Frazin inadvertently referenced Plaintiff's right hand when restating his testimony.  It is,
however, clear from his testimony that any limitations were associated with Plaintiff's left hand, not her right hand:

> ALJ: Can you do the hands again?
>
> DR. FRAZIN: Sure.
>
> ALJ: So, nothing on the right, no limitations on the right?
>
> DR. FRAZIN: No limitations on the right.
>
> ALJ: Okay.  And so, I just need the left hand, then.
>
> DR. FRAZIN: So, overhead would be occasional.
>
> ALJ: Okay.
>
> DR. FRAZIN: And so, let me just [sic] what I'm doing, I was looking at the
> [functional capacity evaluation] from 22-F, was trying to look at the physical
> exam and other findings.  So overhead occasional on the *right* . . . .

(Tr. 75 (emphasis added).)  Further, right before he repeated his testimony in response to the ALJ's request, Dr.
Frazin only identified limitations with respect to Plaintiff's *left* hand.  (Tr. 75.)

but not constant feeling.  (Tr. 75-76.)  Dr. Frazin did not specifically address self-pacing in his testimony.[8]

## 2. ALJ's Decision

In relevant part, the ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work with additional limitations of "sitting up to 6 of 8 hours but 45 minutes at a time, standing up to 1-2 hours total in an 8 hour day but 10-15 minutes at a time, [and] walking at a slow pace."  (Tr. 21.)  As for Plaintiff's upper extremities, the ALJ additionally limited Plaintiff to "occasional fine fingering with the left hand[;] frequent feeling, but not constant on the left[;] frequent gross handling with the left hand, but no limitations with the right, as well as occasional overhead reaching, [and] frequent reaching in all other directions."  (Tr. 21.)

When determining Plaintiff's residual functional capacity, the ALJ gave "significant weight overall" to the functional capacity evaluation, but specifically found that "the self-paced reports are not supported and thus not given weight."  (Tr. 24.)  The ALJ also gave

---

[8] Plaintiff asserts that there are approximately 60 notations of "inaudible" in the hearing transcript during Dr. Frazin's testimony.  (Pl.'s Mem. in Supp. at 29, 35; *see* Tr. 65-77.)  Plaintiff argues that this "mak[es] it difficult to discern [Dr. Frazin's] limitations" and judicial review "impossible."  (Pl.'s Mem. in Supp. at 33.)  The Commissioner does not respond to the state of the transcript.

This is the highest occurrence of "inaudibles" in a transcript for a Social Security hearing that this Court can recall seeing.  Nevertheless, nearly two-thirds of them occurred when Dr. Frazin was summarizing the medical record with references to specific exhibits in the administrative record.  (*See, e.g.*, Tr. 67-72.)  The Eighth Circuit Court of Appeals has stated, "[a]s the medical records are also part of the record, the omission of this summary does not impair the Court's ability to review the ALJ's decision."  *Williams v. Barnhart*, 289 F.3d 556, 558 (8th Cir. 2002) (per curiam).  Another 10 or so occurred while Dr. Frazin was testifying whether Plaintiff's impairments met or equaled a listed impairment—an issue Plaintiff has not challenged here.  (*See, e.g.*, Tr. 72-73.)

The remainder occurred during Dr. Frazin's testimony regarding the limitations he would impose based on the record.  (*See, e.g.*, Tr. 74-76.)  Dr. Frazin did repeat himself and things that were inaudible in one instance were often audible or clarified in another.  Plaintiff has not identified any particular portion of Dr. Frazin's testimony that was not sufficiently captured, and the Court notes that counsel also represented Plaintiff at the hearing before the ALJ.  "Absent an indication that the missing portion of the transcript would bolster [Plaintiff's] arguments or prevent judicial review, this Court will not remand a case based upon inaudible portions of the record."  *Williams*, 289 F.3d at 557-58.

"great weight" to the testimony of the Dr. Frazin. (Tr. 24.) Specifically addressing self-pacing, the ALJ stated:

> [P]ost-hearing, the [Plaintiff's] representative sent in a brief arguing that the [functional-capacity-evaluation] elements of being allowed to self-pace with sitting, standing, and walking activity and self-pace with activities requiring upper extremity coordination should be included. The representative argues that Dr. Frazin accepted the [functional-capacity-evaluation] results including these self-pace elements. However, Dr. Frazin did not state that he accepted those elements of the [functional capacity evaluation] and articulated in his testimony and his opined residual functional capacity the elements he did accept. Further, the exams, objective findings, and her activities do not support the self-pace aspect of the [functional capacity evaluation]. Thus, the self-paced aspect of the [functional capacity evaluation] is given little weight.

(Tr. 24-25.)

### 3. Arguments

Plaintiff asserts that self-pacing "has been prescribed by multiple treating sources" and she testified that she needs to self-pace due to pain. (Pl.'s Mem. in Supp. at 33.)

### a. Self-Pacing Not Prescribed

Plaintiff has not pointed to any evidence in the record where a treating source "prescribed" self-pacing. The examples cited by Plaintiff reflect observations and notations, not imposed limitations. In one instance, a physical therapist noted that Plaintiff walked at a "very slow pace." (Tr. 590.) In another instance, Plaintiff was being evaluated by a psychologist as part of "the initial assessment protocol" for treatment with Dr. Hess, and observed that Plaintiff "is definitely aware of pacing versus persistence in terms of the home chores." (Tr. 1215, 1217.) And, in another instance, Plaintiff had a biofeedback

assessment, and the provider noted that Plaintiff "will be encouraged on mindfulness and pacing strategies."  (Tr. 1333.)

### b.  Plaintiff's Self-Pacing

Plaintiff also relies on her own statements that she self-paces her activities to avoid pain.  In this vein, Plaintiff challenges the ALJ's evaluation of the intensity and persistence of her pain, and the extent to which her pain limits her ability to perform work-related activities.

### i.  Hearing Testimony

At the hearing, Plaintiff testified that she "tr[ies] to pace [her]self and not go crazy on any one day."  (Tr. 47.)  Plaintiff testified that she does "light housework," dusts, picks up, cooks simpler meals, waters her garden, watches television, and spends "a little" time on the computer.  (Tr. 45.)  Plaintiff's husband does the laundry and yardwork.  (Tr. 45.) Plaintiff testified that she has good days and bad days.  (Tr. 45.)  On a good day, Plaintiff might run some errands, clean and cook, doing one activity in the morning before taking a short nap and making dinner.  (Tr. 46.)  On a "great day," Plaintiff testified that she "might be able to do a little bit of sewing" in her sewing room.  (Tr. 46.)  Plaintiff testified that on good days, she could go for about an hour to an hour and a half before needing to stop due to pain.  (Tr. 46-47.)

Plaintiff testified that when she "overdo[es] any one thing," such as cleaning too much, running too many errands, or standing too long, she has a "bad day," and so she has to pace herself.  (Tr. 48.)  On a bad day, Plaintiff attempted to manage her pain through naps, medication, baths, ice, and changing positions.  (Tr. 47, 48.)  Plaintiff was "lucky" if

she could "do some cooking" on a bad day and did not "generally run errands" or do housework. (Tr. 47.)

## ii. Evaluating Symptoms

When determining a claimant's residual functional capacity, an ALJ takes into account the claimant's symptoms, such as pain, and evaluates the intensity, persistence, and limiting effects of those symptoms. *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2016 WL 1119029, at *2 (Soc. Sec. Mar. 16, 2016) [hereinafter SSR 16-3p]; *see, e.g.*, *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017) ("Part of the [residual-functional-capacity] determination includes an assessment of the claimant's credibility regarding subjective complaints.").[9]

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Such evaluation includes consideration of "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain;

---

[9]

> SSR 16-3p became effective on March 28, 2016, and supersedes SSR 96-7p. SSR 16-3p eliminates the use of the term "credibility" from the [Social Security Administration's] sub-regulatory policy, as the regulations do not use this term. In doing so, the [Social Security Administration] clarifies that subjective symptom evaluation is not an examination of an individual's character. Instead, the [Social Security Administration] will more closely follow [the] regulatory language regarding symptom evaluation."

*Krick v. Berryhill*, No. 16-cv-3782 (KMM), 2018 WL 1392400, at *7 n.14 (D. Minn. Mar. 19, 2018) (quotation omitted); *see* SSR 16-3p, 2016 WL 1119029, at *1; *see also Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2017 WL 5180304, at *1 (Soc. Sec. Oct. 25, 2017) (republishing SSR 16-3p and clarifying SSR 16-3p applies to "determinations and decisions on or after March 28, 2016").

(iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029, at *7. This evaluation also includes consideration of "[a]ny measures other than treatment an individual uses or has used to relieve pain (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board)." SSR 16-3p, 2016 WL 1119029, at *7; *see* 20 C.F.R. § 404.1529(c)(3)(vi).

"Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quotation omitted); *see Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("We will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." (quotation omitted)).

### iii. Arguments

Plaintiff argues that the ALJ "failed to perform a credibility analysis," and did not address the relevant factors when evaluating the intensity, persistence, and limiting effects of her pain. (Pl.'s Mem. in Supp. at 38-39; *see* Pl.'s Reply at 3, ECF No. 13.) Plaintiff argues that the ALJ cited an independent medical examination conducted in conjunction with workers compensation proceedings in which she reported that "she was independent in her functioning and could do her daily activities," but "the report shows they were accomplished through pacing." (Pl.'s Mem. in Supp. 38.) According to Plaintiff, "[t]he ALJ provided no other credibility analysis." (Pl.'s Mem. in Supp. at 38.)

When considering the intensity, persistence, and limiting effects of Plaintiff's pain, the ALJ specifically acknowledged the requirements of 20 C.F.R. § 404.1529. (Tr. 29.) The ALJ determined that although Plaintiff's medically determinable impairments could reasonably be expected to produce her symptoms, Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 22.) The ALJ then considered Plaintiff's pain and self-pacing in conjunction with the objective medical evidence, Plaintiff's course of treatment, and Plaintiff's daily activities.

In evaluating the intensity, persistence, and limiting effects of Plaintiff's pain, the ALJ heavily focused on the objective medical evidence. The administrative record in this case contained approximately 1,500 pages of medical records. (*See* Pl.'s Mem. in Supp. at 24.) Not only were there records from Plaintiff's multiple surgeries and treatment providers, but there were also at least two independent medical examinations conducted in conjunction with workers compensation proceedings and at least one functional capacity evaluation. The ALJ extensively discussed the medical evidence. (Tr. 22-26.) The ALJ specifically pointed to places in the record where examinations "show[ed] tenderness, decreased sensation, and some limited range of motion," but also pointed out places in the record where examinations were "largely normal." (Tr. 25.) The ALJ also specifically acknowledged the medical expert's testimony that "neurological problems can certainly wax and wane over[]time." (Tr. 23; *see* Tr. 73.) It is simply not the case, as Plaintiff asserts, that the ALJ "provided no instance of inconsistency between [her] self reports and the medical record." (Pl.'s Reply at 3.) Moreover, Plaintiff fails to point out that, in discussing

the objective medical evidence, the ALJ acknowledged Plaintiff's "significant course of treatment"—a factor which weighed in *favor* of Plaintiff. (Tr. 25.) *See* 20 C.F.R. § 404.1529(c)(3)(v).

Plaintiff is essentially asking this Court to reweigh the medical evidence. The ALJ ultimately concluded that the intensity, persistence, and limiting effects of Plaintiff's pain and allegations of self-pacing were not consistent with the objective medical evidence. (Tr. 22, 25, 26.) It is not surprising that Plaintiff is able to point to some evidence in a record of this magnitude showing greater limitations. *See, e.g.*, *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) ("[I]t is not surprising that, in an administrative record which exceeds 1,500 pages, Fentress can point to some evidence which detracts from the Commissioner's determination."). The Court recognizes that a claimant's symptoms cannot be discounted "solely because the objective medical evidence does not fully support them." *Bernard v. Colvin*, 774 F.3d 482, 488 (8th Cir. 2014) (quotation omitted); *see* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2016 WL 1119029, at *4-5. But, inconsistency with the objective medical evidence is one factor the ALJ is required to consider in evaluating the intensity, persistence, and limiting effects of those symptoms. SSR 16-3p, 2016 WL 1119029, at *5; *see* 20 C.F.R. § 404.1529(a), (c). The ALJ's extensive discussion of the record demonstrates that the ALJ thoroughly considered the objective medical evidence, taking into account Plaintiff's significant course of treatment, and overall found the objective medical evidence inconsistent with the severity of pain alleged and a need to self-pace.

In addition to the objective medical evidence, the ALJ also discussed Plaintiff's daily activities. Plaintiff states that the ALJ erroneously relied on an independent medical examination to demonstrate that she is independent in her daily activities because "the report shows they were accomplished through pacing." (Pl.'s Mem. in Supp. at 38.)

The independent medical examination states: "She told me she participates in most household activities including shopping, cooking, cleaning, and meal preparation. She is able to feed, dress and bathe herself and is completely independent in all of her activities of daily living. She is able to drive a motor vehicle." (Tr. 1966.) When discussing the independent medical examination, the ALJ observed that Plaintiff "reported that she is able [to] feed, dress and bathe herself, and is completely independent in all of her activities of living. In addition, she reported that she is able to drive." (Tr. 26.) The ALJ concluded that "[t]his information does not support the allege[d] disabling limits and the self-pace limits described in the [functional capacity evaluation] as well as the limits argued as disabling by the claimant's representative." (Tr. 26.) Plaintiff has not specifically articulated where (or what) in the independent medical examination supports self-pacing. The Court has reviewed the independent medical examination, and there is no reference to self-pacing in conjunction with Plaintiff's daily activities.

A claimant's daily activities is evidence outside of the objective medical evidence that an ALJ may consider as a factor when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3)(i); SSR 16-3p, 2016 WL 1119029, at *7. "[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling

pain." *Halverson*, 600 F.3d at 932 (quotation omitted); *see, e.g.*, *Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015) ("Wright himself admits to engaging in daily activities that this court has previously found inconsistent with disabling pain, such as driving, shopping, bathing, and cooking."); *Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014) ("Ponder's activity level undermines her assertion of total disability. Indeed, Ponder admitted that she, among other things, performs light housework, washes dishes, cooks for her family, does laundry, can handle money and pays bills, shops for groceries and clothing, watches television, drives a vehicle, leaves her house alone, regularly attends church, and visits her family."); *Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007) ("Wagner engaged in extensive daily activities, such as fixing meals, doing housework, shopping for groceries, and visiting friends."). Plaintiff has not challenged the ALJ's characterization of the nature of her daily activities, and the Court will not craft arguments for her. *See Laveau v. Astrue*, No. 11-cv-505 (SRN/LIB), 2012 WL 983630, at *12 n.6 (D. Minn. Feb. 14, 2012), *adopting report and recommendation*, 2012 WL 983630 (D. Minn. Mar. 22, 2012).

Nor was the ALJ required to discuss each of the factors set forth in 20 C.F.R. § 404.1529(c)(3). SSR 16-3p, 2016 WL 1119029, at *7; *see Bryant*, 861 F.3d at 782; *Halverson*, 600 F.3d at 932. Other than the discussion of the independent medical examination, Plaintiff broadly asserts that the ALJ failed to consider the relevant factors when evaluating the intensity, persistence, and limiting effects of her pain and need to self-pace without acknowledging those factors that the ALJ did consider or specifically articulating how *any* of the factors should have been resolved in her favor. "Although it is the ALJ's responsibility to determine the claimant's [residual functional capacity], 20

C.F.R. §§ 404.1545(a); 404.1546(c), the burden is on the claimant to *establish* his or her [residual functional capacity]." *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016) (emphasis added). Here, the ALJ gave good reasons for finding that the alleged intensity, persistence, and limiting effects of Plaintiff's pain were not consistent with the overall evidence in the record within the framework of 20 C.F.R. § 404.1529. *See Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) ("Although the ALJ never expressly cited *Polaski* (which is our preferred practice), the ALJ cited and conducted an analysis pursuant to 20 C.F.R. §§ 404.1529 and 416.929, which largely mirror the *Polaski* factors.").

Based on the foregoing, the Court concludes that there is substantial evidence in the record to support the ALJ's decision not to include self-pacing in Plaintiff's residual functional capacity.

### C. Concentration & Focus

Plaintiff next argues that the ALJ failed to include cognitive limitations for concentration and focus, contending that "[t]he record is replete with instances showing that [she] has cognitive limitations." (Pl.'s Reply at 3.) Plaintiff relies on the testimony of the medical expert that a person experiencing pain "will often have decreases in concentration," (Tr. 76-77); a physical residual functional capacity questionnaire in which Dr. Will[10] circled "often" when asked how often Plaintiff's pain and other symptoms are

---

[10] The physical residual functional capacity questionnaire was co-signed by Herrmann. Under the applicable regulations, Dr. Will is an acceptable medical source and Hermann is not. *See* 20 C.F.R. §§ 404.1502 (identifying claimant's own physician as treating source), .1513(a)(1) (identifying licensed physicians as acceptable medical sources); *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 5845-46, 5863 (Jan. 18, 2017) (including advanced practice registered nurses among the types of acceptable medical sources for claims

"severe enough to interfere with attention and concentration," (Tr. 1202); and two physical residual functional capacity questionnaires completed by Dr. Hess, who circled "constantly" in response to the same question and elsewhere noted that Plaintiff's medication "makes it difficult to concentrate at times," (Tr. 1700; *accord* Tr. 1955-56). Plaintiff also points to the car accident in which she fell asleep behind the wheel, attributing her fatigue to her CRPS and medications.[11] (Tr. 404; *see* Tr. 1327.) Notably, while Plaintiff asserts "[t]he record fully supports limits on concentration and focus," (Pl.'s Mem. in Supp. at 37), she fails to identify what additional functional limitations the ALJ should have included.

Here, the ALJ found that Plaintiff had no more than "mild limitations in mental functioning," including her ability to maintain concentration, persistence, or pace, based on her function reports and testimony. (Tr. 18.) *See Finch v. Astrue*, 547 F.3d 933, 937 (8th Cir. 2008). The ALJ noted that Plaintiff sews small quilts for about an hour at a time, drives, watches television, and uses her computer. (Tr. 19.) The ALJ also noted that Plaintiff was "usually negative for mental health symptoms." (Tr. 18.) The ALJ pointed to evidence in the record showing that Plaintiff was "consistently alert and oriented to person, place, and time," and her "attention span and concentration were reasonable." (Tr. 19.) The ALJ went on to recognize that "Dr. Hess did opine that pain could limit

---

filed on or after March 27, 2017) (to be codified at 20 C.F.R. § 404.1502). The ALJ treated it as a joint "medical source statement." (Tr. 26) The parties refer to it as Dr. Will's opinion. (*See, e.g.*, Pl.'s Mem. in Supp. at 33; Def.'s Mem. in Supp. at 10, ECF No. 12.)

[11] In her reply brief, Plaintiff refers to "car accident*s*" (plural) resulting from "falling asleep while driving." (Pl.'s Reply at 3.) This Court is only aware of one such accident in 2015 and, as correctly pointed by the Commissioner, Plaintiff continued to drive following the accident. (Def.'s Mem. in Supp. at 13; *see, e.g.*, Tr. 1319, 1327, 2003, 1966.)

[Plaintiff's] attention and concentration," and limited Plaintiff to unskilled[12] work "based on pain."  (Tr. 18.)

Although Plaintiff has pointed to other evidence in the record that could support additional limitations, there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff had no more than mild limitations in mental functioning, and therefore no additional cognitive limitations were warranted.  *See Finch*, 547 F.3d at 937 ("Although there is evidence in the record that might sustain a different finding, the ALJ's determination is supported by substantial evidence.").

---

[12] Neither party has addressed the fact that, while the ALJ stated that a limitation for "unskilled" work was being included in Plaintiff's residual functional capacity, such a limitation was not included in the ALJ's articulation of Plaintiff's residual functional capacity or in the hypotheticals posed to the vocational expert.  (Tr. 21; *see* Tr. 77-85.)  Even if this issue had been raised, any error would likely have been harmless as each of the jobs identified by the vocational expert were rated at a specific vocational preparation level of two, which is unskilled work.  (Tr. 28, 81-82.)  *See Hulsey v. Astrue*, 622 F.3d 917, 922-23 (8th Cir. 2010) ("According to the regulations, unskilled work 'needs little or no judgment to do simple duties that can be learned on the job in a short period of time.' 20 C.F.R. § 416.968(a).  Unskilled work is the 'least complex type [ ] of work,' SSR 82-41, 1982 WL 31389 (1982), corresponding to a specific vocational preparation (SVP) level of one or two in the DOT.  SSR 00-4P, 2000 WL 1898704 (Dec. 4, 2000)." (alteration in original)); *see also Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, Byes must provide some indication that the ALJ would have decided differently if the error had not occurred.").

On remand, *see infra* Sections IV.D.2, E, the ALJ should be sure to include this limitation in both the articulation of Plaintiff's residual functional capacity and in the hypotheticals posed to the vocational expert.  *See, e.g.*, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) ("An ALJ must include only those impairments and limitations he found to be supported by the evidence as a whole in his hypothetical to the vocational expert." (quotation omitted)); *Scott v. Berryhill*, 855 F.3d 853, 857 (8th Cir. 2017) ("[A] vocational expert's testimony must be based on a hypothetical that captures the concrete consequences of the claimant's deficiencies." (quotation omitted)); *McCoy*, 648 F.3d at 614 ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) ("[Residual functional capacity] is defined as the most a claimant can still do despite his or her physical or mental limitations." (quotation omitted)); *Miller v. Colvin*, 114 F. Supp. 3d 741, 779 (D. S.D. 2015) ("Limitations which result from mild physical and mental impairments must be included in the claimant's [residual functional capacity].").

**D. Opinion Evidence**

Plaintiff further asserts that the ALJ did not give proper weight to Dr. Hess's opinions and Dr. Will's opinion that Plaintiff would be absent from work three to four times per month.

Drs. Hess and Will are both treating physicians. *See* 20 C.F.R. §§ 404.1502, .1513(a)(1). A treating source's "opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin*, 826 F.3d at 1088; *accord Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014).

"Yet[, this controlling] weight is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted). The opinions of treating physicians "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see Cline*, 771 F.3d at 1103 (permitting the opinions of treating physicians to be discounted or disregarded "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions") (quotation omitted). When a treating source's opinion is not given controlling weight, the opinion is weighed based on a number of factors, including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R.

§ 404.1527(c); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ is required to "give good reasons" for the weight assigned to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *Cline*, 771 F.3d at 1103.

### 1. Dr. Hess

#### a. Dr. Hess's Opinions

Dr. Hess gave two nearly identical opinions in this case, one in June 2016 and one in March 2017, via the completion of a physical residual functional capacity questionnaire. (Tr. 1700-05, 1955-1960.) Dr. Hess listed Plaintiff's primary diagnoses as CRPS and described her prognosis as "poor." (Tr. 1700, 1955.) Dr. Hess identified Plaintiff's symptoms as pain and fatigue, stating that she experiences pain in her extremities daily and on a constant basis. (Tr. 1700, 1955.) Dr. Hess noted that Plaintiff "describes [her] pain as shooting, pricking, stabbing, sharp, burning, tingling, tiring, [and] exhausting." (Tr. 1700; *accord* Tr. 1955.)

Each time, Dr. Hess was asked to "[i]dentify the [supporting] clinical findings and objective signs." (Tr. 1700, 1955.) In June, Dr. Hess listed: "[d]iscoloration, temperature changes, [and] allodynia[13] of [left upper extremity]; vascular instability, allodynia, temp[erature] changes, [and] decreased sensation in the [left upper [sic] extremity and]

---

13

> The key symptom [of CRPS] is prolonged severe pain that may be constant. It has been described as "burning," "pins and needles" sensation, or as if someone were squeezing the affected limb. The pain may spread to the entire arm or leg, even though the injury might have only involved a finger or toe. In rare cases, pain can sometimes even travel to the opposite extremity. There is often increased sensitivity in the affected area, known as *allodynia*, in which normal contact with the skin is experienced as very painful.

*CRPS Fact Sheet.*

spread to [right lower extremity]."  (Tr. 1700.)  In March, Dr. Hess listed: "+CRPS symptoms including vascular instability, allodynia, temperature changes [and] decreased sensation." (Tr. 1955.)

Dr. Hess noted that Plaintiff's medications, Oxycontin[14] and Percocet[15], "make[] it difficult [for her] to concentrate at times."  (Tr. 1700; *accord* Tr. 1955.)  When asked how often Plaintiff's pain, other symptoms, and medication side-effects were severe enough to interfere with her attention and concentration, Dr. Hess opined they were this severe between 75 and 100% of the day.  (Tr. 1701, 1956.)  Dr. Hess similarly opined that Plaintiff's pain and other symptoms would interfere with her attention and concentration "[c]onstantly." (Tr. 1701; *accord* Tr. 1956.)

Dr. Hess opined that Plaintiff was "[i]ncapable of even 'low stress' jobs," and met the "criteria for permanent [and] total disability."  (Tr. 1702; *accord* Tr. 1957.)  When asked about Plaintiff's functional limitations, Dr. Hess "[r]efer[red] to the significant restrictions per [Plaintiff's] functional capacity evaluation."  (Tr. 1702; *accord* Tr. 1957.)

### b.  Weight Assigned to Dr. Hess

The ALJ gave "little weight " to Dr. Hess's opinions.  (Tr. 25.)  The ALJ noted that "[t]hese forms are generic and conclusory with no reference to his exams and findings or objective evidence."  (Tr. 25.)  The ALJ additionally noted that "[a] finding of disability is

---

[14] Oxycontin is a brand name for an extended-release tablet of oxycodone, and is "used to relieve severe pain in people who are expected to need pain medication around the clock for a long time and who cannot be treated with other medications."  *Oxycodone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682132.html (last visited Sept. 17, 2019).
[15] Percocet is a brand name for a combination of oxycodone and acetaminophen.  *Id.*

reserved to the [C]omissioner under the Social Security Administration (SSA) standard of disability."  (Tr. 26.)

### c. Arguments

Plaintiff argues that the ALJ erred in assigning little weight to Dr. Hess's opinions by "finding them generic, conclusory and containing no reference to his examination findings" because, "[t]o the contrary, Dr. Hess noted objective findings of discoloration and temperature changes, allodynia of her left arm, vascular instability, allodynia and temperature changes with decreased sensation when stating his opinions."  (Pl.'s Mem. in Supp. at 34.)  Dr. Hess's opinions can be broken down into three parts: (1) Plaintiff is permanently and totally disabled; (2) Plaintiff's pain, other symptoms, and medication side-effects would interfere with her attention and concentration; and (3) the functional capacity evaluation.

Plaintiff does not take issue with the first part—the ALJ's rejection of Dr. Hess's conclusion that Plaintiff is permanently and totally disabled—nor could she.  "A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."  *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005); *see* 20 C.F.R. § 404.1527(d)(1), (3); *see also, e.g.*, *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010) ("[O]pinions that a claimant is 'disabled' or 'unable to work' concern issues reserved to the Commissioner and are not the type of opinions which receive controlling weight."); *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no

deference because it invades the province of the Commissioner to make the ultimate disability determination.").

The second part—limitations on attention and concentration—was specifically addressed by the ALJ earlier in the decision. As discussed above, *see supra* Section IV.C, the ALJ acknowledged this part of Dr. Hess's opinions but found that the limitations identified were not consistent with other evidence in the record, including Plaintiff's function reports and testimony, as well as the medical evidence. For the reasons discussed above, the ALJ's determination that Plaintiff had no more than mild limitations in mental functioning, including maintaining concentration, persistence, or pace, is supported by substantial evidence in the record as a whole. And as discussed above, the ALJ went on to limit Plaintiff to unskilled work based on her pain.

The third part—support of the functional capacity evaluation—was also addressed by the ALJ, albeit in terms of the functional capacity evaluation itself. As discussed above, *see supra* Section IV.B, the ALJ gave significant weight to the functional capacity evaluation except as to self-pacing. The ALJ's residual-functional-capacity determination is largely consistent with the functional capacity evaluation with respect to limitations on sitting, standing, and walking. The ALJ's residual-functional-capacity determination was also generally consistent with the functional capacity evaluation concerning Plaintiff's use of her upper extremities and, at times, *more limited* based on Dr. Frazin's testimony. Plaintiff has not specifically identified what additional limitations from the functional capacity evaluation should have been included in her residual functional capacity other

than self-pacing.[16] *See Byes*, 687 F.3d at 917. And, for the reasons stated above, the Court has concluded that the ALJ's decision not to include self-pacing in Plaintiff's residual functional capacity is supported by substantial evidence in the record as a whole.

Plaintiff is correct that the ALJ's statement that Dr. Hess's opinions were "generic and conclusory with no reference to his exams and findings or objective evidence" is contradicted by the opinions themselves, wherein Dr. Hess listed several findings and objective signs. Viewed in isolation, the ALJ's statement arguably suggests that the ALJ did not properly consider Dr. Hess's opinions. Viewed in the context of the entire decision, however, it is plainly apparent that the ALJ considered each of the three parts of Dr. Hess's opinions, and the treatment of each is supported by substantial evidence in the record as a whole. True, the ALJ could have explained the weight assigned to Dr. Hess's opinions better, and perhaps repeated and further elaborated on some of the analysis contained elsewhere in the decision. But, "an arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome." *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992) (quotation omitted); *see, e.g.*, *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) ("We will not set aside an administrative finding based on an arguable deficiency in opinion-writing technique when it is unlikely it affected the outcome." (quotation omitted)). Therefore, the Court concludes that the ALJ did not err in assigning little weight to Dr. Hess's opinions.

---

[16] *See supra* n.6.

### 2. Dr. Will

Among other things, Dr. Will opined in a physical functional capacity questionnaire that Plaintiff was "likely to be absent from work as a result of [her] impairments or treatment" approximately "three times per month." (Tr. 1205.) Overall, the ALJ gave the other limitations Dr. Will identified "some weight, but the disabling elements of being absent are given little weight, as the record does not support a need for three absences per month." (Tr. 26.)

In doing so, the ALJ did not explain what evidence in the record contradicted Dr. Will's opinion regarding the amount of time Plaintiff was likely to be absent from work due to her impairments and treatment. For example, the ALJ did not state that Dr. Will's opinion regarding Plaintiff's absences was inconsistent with the treatment notes. *See Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009) ("But the ALJ noted that Dr. Junaid's treatment records do not substantiate the need for some degree of absenteeism. As a result, the ALJ gave Dr. Junaid's opinions 'only limited weight.'"); *see also Lusardi v. Astrue*, 350 F. App'x 169, 172 (9th Cir. 2009) (mem.) ("The ALJ noted that there was nothing within Dr. Zoubek's records to support a conclusion that Lusardi might be subject to excessive work absenteeism. His records consistently reflect that her condition was stable and well-controlled. At the time of the opinion, he believed it necessary to examine Lusardi only twice per year, which the ALJ noted was 'a level of treatment hardly consistent with debilitating symptoms.'").

"A physician's opinion that a claimant would miss work due to the severity of her impairments must be given weight if supported by the record." *Swanson v. Astrue*, No. 09-

cv-1737 (MJD/JJK), 2010 WL 3118785, at *19 (D. Minn. May 3, 2010) (citing *Baker v. Apfel*, 159 F.3d 1140, 1146 (8th Cir. 1998)), *adopting report and recommendation*, 2010 WL 3118691 (D. Minn. Aug. 4, 2010).  While Plaintiff averaged approximately 1 appointment per month at Twin Cities Pain Clinic in 2013, her appointments doubled to approximately two appointments per month in 2014.  In 2015 and through most of 2016, Plaintiff averaged two appointments per month with Dr. Hess.  And, these are just the appointments with Twin Cities Pain Clinic and Dr. Hess.  These numbers do not account for the various other types of appointments—including physical therapy, occupational therapy, and biofeedback assessments—that Plaintiff was also attending.

Plaintiff's residual functional capacity "must be based on [her] ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy*, 648 F.3d at 617 (quotation omitted).  At the hearing, the vocational expert testified that "someone could miss up to two days a month," and "missing part of a day . . . [would] count[] as a full day missed." (Tr. 83; *see* Tr. 84.)  The ALJ recognized the significance of Dr. Will's opinion as to the number of times Plaintiff was likely to be absent per month, calling it "the disabling element[] of being absent."  (Tr. 26.)

The frequency of Plaintiff's medical appointments and her significant course of treatment are consistent with Dr. Will's opinion that she was likely to be absent three times per month due to her impairments and treatment.  *See Baker*, 159 F.3d at 1146 ("Both these opinions are amply supported by page after page of medical records detailing Baker's injections of Demerol, after which he must be driven home by someone else due to the

effects of the drug."); *cf. Petteway v. Comm'r of Soc. Sec.*, 353 F. App'x 287, 290 (11th Cir. 2009) (per curiam) ("[G]ood cause existed to reject the opinion because Dr. Leber's conclusion [that Petteway would be absent four days per month] was inconsistent with Petteway's medical records, which showed infrequent medical visits at intervals of two or more months."). While the Commissioner asserts that "Plaintiff overlooks that treatment can often be scheduled outside of an individual's work schedule," (Def.'s Mem. in Supp. at 10), "defense counsel is not a medical doctor, and cannot contradict the opinion of a treating physician without giving good reasons for doing so, such as reliance on another, conflicting acceptable medical opinion," *Merkel v. Comm'r of Soc. Sec.*, 350 F. Supp. 3d 241, 249 (W.D. N.Y. 2018). The Commissioner has pointed to no such evidence here.

"To determine if a treating physician's opinion should control, the record must be evaluated as a whole and the opinion must not be inconsistent with the other substantial evidence." *Chaney*, 812 F.3d at 679 (quotation omitted). There may be good reasons for not giving controlling weight to Dr. Will's opinion regarding Plaintiff's degree of absenteeism. Or, based on the record as a whole, it may be that Plaintiff would be absent from work between one and two times per month, which the vocational expert testified would be tolerated by an employer. But, the ALJ must clearly explain the reasons behind the weight assigned to Dr. Will's opinion in a manner that allows the Court to determine whether the ALJ's reasoning, and the residual-functional-capacity determination, is supported by substantial evidence in the record as a whole.

### E. Conclusion

Therefore, the Court will remand this matter for reconsideration of Dr. Will's opinion regarding Plaintiff's degree of absenteeism at step four and vacate the ALJ's decision as to step five. Because the Court is directing the ALJ to reconsider Dr. Will's opinion regarding Plaintiff's degree of absenteeism at step four and vacating the ALJ's decision as to step five, it does not reach Plaintiff's remaining assignments of error at step five regarding the hypothetical questions posed to the vocational expert and consideration of the qualified rehabilitation consultant's opinion that Plaintiff is not employable.[17] On remand, the ALJ should make clear both when articulating Plaintiff's residual functional capacity and posing hypotheticals to the vocational expert that there is an additional limitation that the work be unskilled.[18] The ALJ's decision is otherwise affirmed.

[Continued on next page.]

---

[17] The Court notes, however, that the ALJ expressly considered this opinion and gave it "little weight" because, among other reasons, it was "based on a different standard defining unable to work/unemployable" and "focus[ed] on [Plaintiff's] inability to perform her work as a baker." (Tr. 25.)

[18] *See supra* n.12.

## V. ORDER

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY**

**ORDERED** that:

1. Plaintiff's Motion for Summary Judgement (ECF No. 9) is **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's Motion for Summary Judgment (ECF No. 11) is **GRANTED IN PART** and **DENIED IN PART**.

3. The Commissioner's decision is **AFFIRMED** as to steps one through four, except as to the consideration of Dr. Will's opinion regarding Plaintiff's degree of absenteeism at step four, and **VACATED** as to step five.

4. This matter is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September ___26___, 2019                    _____*s/ Tony N. Leung*_____
                                                   Tony N. Leung
                                                   United States Magistrate Judge
                                                   District of Minnesota

                                                   *Barbara M. v. Saul*
                                                   Case No. 18-cv-1749 (TNL)